

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7469 | **DATE** | 2/5/2004 |
| **CASE TITLE** | Smith vs. Union Pacific Railroad | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ _.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_ ___.

(4) ☐ Ruling/Hearing on ___ __ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on __ __ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for __ ____ at __ ____.

(7) ☐ Trial[set for/re-set for] on ____ _ at ____ __.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ____ _ at __. _.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, plaintiff's motion for summary judgment [11-1] is denied, defendant's motion for summary judgment is granted [17-1]. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | FEB 0 6 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 30 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| MF | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT SMITH,　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）　**DOCKETED**
　　　　　　Plaintiff,　　　　　　　）　**FEB 06 2004**
　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）　No. 02 C 7469
v.　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）　Judge John W. Darrah
UNION PACIFIC RAILROAD,　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　Defendant.　　　　　　　）

## MEMORANDUM OPINION AND ORDER

Plaintiff, Robert Smith, filed a suit against the Defendant, Union Pacific Railroad, alleging Union Pacific failed to accommodate his disability in violation of the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Both parties have moved for summary judgment.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Smith began working for Union Pacific on November 30, 1998. Smith was hired to work on a road, as opposed to a yard, in the seniority district headquartered in St. Louis on the St. Louis

30

Service Unit. Smith had six to eight weeks of training and was then assigned to work train runs from Dupo, Illinois to Jefferson City, Missouri. Smith always worked under the supervision of a qualified conductor and never completed enough trips to work without supervision. Smith was furloughed in February 1999. (Def.'s 56.1(a)(3) Statement ¶ 13).

In early 2000, Union Pacific determined that it had a shortage of trainmen/conductors on the Chicago Service Unit ("CSU"). Before hiring new employees, Union Pacific mailed letters to furloughed conductors from St. Louis and other areas that offered the opportunity to transfer seniority to a district on the CSU. In accordance with the customary practice and as was provided by the various collective bargaining agreements, employees accepting the transfer had to relinquish their seniority rights on their former district and start with a new seniority date as of the date of transfer to the new district. (Def.'s 56.1(a)(3) Statement ¶ 14). The transfer also carried some incentives to induce employees to transfer. The employees were provided motel lodging for 30 days plus a per diem and other allowances. In addition, those accepting transfer were paid bonus incentives of $1,500 as soon as they transferred and an additional $3,000 after working 60 days in the new district. An additional $4,000 would be paid after 180 days if they were "marked up" (available for service) and working at the new location. (Id., 16).

Smith was offered and accepted the transfer to be a conductor/brakeman on road seniority district NE 2. Smith accepted the transfer only because he was advised that after a year on furlough, he would lose all employment rights. Subsequent to Smith's accepting the transfer, Fred Sagedal, the manager of Manpower Planning for the Northern Region, which includes the CSU, learned from Labor Relations that an exception was reached waiving this provision for one time. (Def.'s 56.1(a)(3) Statement ¶ 16).

Smith began orientation training at Proviso on February 28, 2000. Smith started working as a trainee on his new seniority district on March 7, 2000. He worked with qualified conductors on trains traveling from Proviso to Janesville and Milwaukee, Wisconsin. Smith did not complete the familiarization and qualification training on the NE 2 district and did not qualify to work alone as a conductor. (Def.'s 56.1(a)(3) Statement ¶ 18). Smith was not happy with his transfer, especially after learning that others who did not transfer did not lose their seniority. Smith also felt that there were a number of advantages to working under the St. Louis collective bargaining agreement compared to the CSU collective bargaining agreement (Id., ¶ 17). Smith received the first of the two incentive payments of $1,5000 and $3,000. Smith was not eligible for the final payment because he was not actively working 180 days after he accepted the transfer. (Id., ¶ 23).

Between March 7 and May 7, Smith missed several days of work. According to records and a calendar generated by Crew Management Services, Smith missed calls on April 10 and 12 and was shown as "laid off personal." From April 20 through 23, the crew caller records show Smith's status as "laid off sick." (Def.'s 56.1(a)(3) Statement ¶ 24). Smith did not work after May 7, 2000, although he was called for work for a period of time. The CMS records show that beginning on May 8, Smith was laid off on personal leave until May 13, then laid off sick for a day-and-a-half, then missed calls from May 15 through 26, except for May 16 when it is reported that he refused a call. (Id., ¶ 25).

On May 27, 2000, Sagedal became aware of Smith's failure to be available for work. Sagedal directed the crew caller to contact Smith and direct Smith to call Sagedal concerning his status. The crew caller records show that on May 26, 2000, Smith's home telephone was called and that a woman answering the telephone stated that Smith was out but had been there and that she

3

would convey the message that Smith was to contact Sagedal about Smith's status. Sagedal also directed that Smith be considered as AWOL and carry the status of "EA", meaning evading assignment, until Smith contacted him. (Def.'s 56.1(a)(3) Statement ¶ 26). Smith lived at his parents' home at this time, and his mother was the only woman living there at this time. Smith was not aware of receiving the message to call Sagedal, although he is certain that his parents would have conveyed the message. Smith had previously talked with Sagedal on several occasions concerning the transfer of seniority districts but did not relate to Sagedal that he had any mental health issues. Smith never told anyone at the railroad about any mental health issues before he transferred to Chicago. (Id., ¶ 27).

Once Smith's status was changed to EA, the crew callers did not try to contact him for assignments. The EA status also removed Smith from the monthly reports that identified for the service units those employees whose attendance reflected missed weekend calls and other sporadic attendance problems. (Def.'s 56.1(a)(3) Statement ¶ 28). Smith never called or otherwise contacted Sagedal after May 26, 2000. Sagedal never received any other information about Smith's status from any source until he inquired about Smith in January 2001. (Def.'s 56.1(a)(3) Statement ¶ 29).

Smith did not disclose any history of depression or mental health problems on his employment application, wherein he agreed to truthfully answer all pertinent questions connected with a physical examination. Smith completed and signed as truthful a "Post-Offer Pre-Placement Medical History" and checked "no" to lines asking if he had ever had any anxiety/depression or other mental problems, took any medications, or had any problems that might interfere with his ability to work safely and efficiently. He also indicated that he did not need any accommodations to work safely or efficiently. (Def.'s 56.1(a)(3) Statement ¶ 30).

4

Smith claims that he stopped working in May 2000 because of depression, a condition first diagnosed in 1990 or 1991. He testified that while he was still working at Proviso, he felt he needed time off of work to see a doctor since his medication was running low; but he did not believe that he was able to see his doctor despite taking time off in April 2000. (Def.'s 56.1(a)(3) Statement ¶ 31). Smith felt that he was "a little depressed" about being forced to stay in Chicago, which caused him to be away from his family and support system. Another factor that may have been a precipitating factor of his stopping work was the "fluctuating work schedule." (Id., ¶ 32). Smith also felt anxiety and frustration about one of the conductors with whom he was training, since their "personalities just didn't mesh" and he would have preferred to work with another individual. (Id., ¶ 33; Plaint.'s Response ¶ 33).

Smith claims that before he left the Chicago area, he told a crew caller that he was sick and needed some time off from work. He did not contact anyone else with the railroad at this time about his status. Upon returning to his home area, Smith did not immediately seek medical treatment. (Def.'s 56.1(a)(3) Statement ¶ 34). A crew caller can allow employees in the Chicago area to mark off sick but only for 12 to 24 hours and for not more than 3 days. After that, a manager in CMS or in the field would have to be involved. Due to the number of employees, such statuses are not monitored on a daily basis. (Id., ¶ 35).

Sometime in June 2000, Smith telephoned Don Warner of Union's Employee Assistance Program. Smith told Warner that he was off sick, and Warner asked about his illness. Smith explained that he had some problems with depression. He told Warner that he was being treated for his condition and needed information about how to take time off from work. Warner asked if he wanted EAP assistance to obtain counseling, but Smith said he was getting counseling and just

5

needed information about a leave. Warner told Smith that he needed to contact his local manager and let them know that he was ill. (Def.'s 56.1(a)(3) Statement ¶ 37). Warner told Smith that he needed to contact his service unit to arrange for a leave of absence because Smith did not want Employee Assistance to open a file on him to oversee his status. Warner advised Smith that without opening a file, there was really nothing the Employee Assistance could do for Smith. (Warner Dep. ¶¶ 12, 13). Smith testified that he also informed Warner that he had been diagnosed as maniac-depressive. (Plaint.'s Dep. p. 116).

On July 27, 2002, Smith wrote a letter to David Barnes, General Superintendent of the Chicago Service Unit at Proviso. The letter stated:

> Recently I have been made aware that despite having taken the appropriate action to mark off sick, my status has been defined as "evading assignment." In addition to being wrong, it is personally distressing. I am still undergoing medical treatment. I have discussed my condition with Don Warner of Employee Assistance, and I am presently unable to specify when I might return to work.
> Please note that this communication was forwarded to Al Weed, Labor Relations, Omaha, Nebraska, on July 12, 2000.
> Thank you for your understanding.

(Def.'s 56.1(a)(3) Statement ¶ 41). After receiving and reading Smith's letter, Barnes had the letter filed because it did not ask Barnes to do anything and considered it to be strictly confidential. (Id., ¶ 42). Barnes was never advised by Smith or anyone else that Smith claimed to have a disability. Smith never contacted Barnes to request any type of accommodation. Nobody ever contacted Barnes on Smith's behalf about Smith's employment status. (Id., ¶ 45).

In August 2000, Smith wrote two letters to Warner indicating that he was still being identified as evading work and that he had contacted individuals in Chicago and Omaha as Warner had previously required. Smith asked Warner "to advise at the soonest convenient time" about his

status not changing and if additional information pertaining to his disability or need for accommodation was required. Warner did not respond to the letters. (Def.'s 56.1(a)(3) Statement ¶ 48; Exh. 2, 3 to Thompson Dep.) Warner avers that he did not respond to the letters because he had already advised Smith that Smith had to contact his local manager, his service unit, and have Employee Assistance open a file, which Smith indicated he did not want. Warner did not believe a further response was necessary. (Warner Affidavit ¶15).

On October 25, 2000, Mark England, Smith's therapist, wrote a letter to Warner. In the letter, England informed Warner that Smith had been receiving services at the Springfield Mental Health Center since August 1999 and that, in January 2000, Smith was experiencing a major depressive episode. At that time, England recognized that in order to stabilize Smith's condition, Smith would be unable to work. England wrote Smith had expressed concern that despite contact with Warner and other company individuals, that Smith's employment may be threatened. England also stated that Smith was "currently functioning quite well but may possibly, in the future, require additional time off." England informed Warner that he could contact England if more information was required. (Plaint.'s 56.1(a)(3) Statement ¶ 63, Exh. 8 of Smith's Dep.). Warner considered England's letter as informational but of little relevance since Smith had declined opening a file with EA. Warner did not understand England's letter to be a request for accommodation for Smith. (Warner Affidavit ¶ 18-19).

On January 26, 2001, Sagedal discovered that Smith was still missing work. Sagedal caused an Employee Absenteeism Profile to be generated that showed Smith had not worked since May 7, 2000. Sagedal contacted the CSU to find out if Smith was covered by a leave of absence. (Def.'s 56.1(a)(3) Statement ¶ 50). Upon learning that Smith did not have a leave of absence,

7

Sagedal determined that Smith was in violation of Rule 96 of the CBA. Rule 96 provides that an employee who is absent of his own accord for more than six months forfeits all rights except in case of sickness or when a leave of absence is granted. (Id., ¶ 51).[1] Sagedal sent an e-mail to the CSU advising them of the Rule 96 violation and directed the service unit to send a letter to Smith advising him that he had lost his seniority and terminating his employment. The termination letter was sent on February 9, 2001. (Id., ¶ 52). The termination letter was sent over Barnes' signature. (Id., ¶ 44).

On February 17, 2001, Smith wrote a letter to Barnes challenging his termination. (Plaint.'s 56.1(a)(3) Statement ¶ 68). On February 22, 2001, Barnes wrote Smith advising him that his termination would not be changed. In the letter, Barnes indicated that Union Pacific did not initiate Smith's termination; but, rather, his termination was "the natural consequence of the self-executing rule mandating removal from the seniority roster after unauthorized absence for six consecutive months." (Id., ¶ 69).

At his deposition, Smith testified that he has had a very chronic anxiety disorder since he was a child and has, on repeated occasions, experienced major depressive episodes. (Plaint.'s 56.1(a)(3) Statement ¶ 2). Smith was first diagnosed as suffering from an anxiety disorder and depression in 1990 or 1991. (Id., ¶¶ 34-35). Smith believes that he was hospitalized in March or April 1996 because of his depression. (Id., ¶ 36). Smith has taken medications to treat his depression and anxiety. (Id., ¶ 37).

In an affidavit, Smith avers that he suffers from depression and anxiety disorder and that his depression manifests itself periodically in major depressive episodes. During these episodes, Smith

---

[1] Smith does not allege any claims that require the application of the CBA. This Court would lack jurisdiction to decide claims that require the application of the CBA. *See Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 669 (7th Cir. 2001).

has negative ideations, decreased appetite, and lack of energy and desire to sleep and fatigue. Smith also ceases having contact with others and becomes very isolated. Smith is withdrawn and has no social interactions with other individuals during these episodes. He avers that a major depressive episode commenced in January 2000. The episode became very severe in May 2000 and lasted until September or October of 2000. During this time, Smith became totally isolated, and for the majority of the time, did not engage in social contact with others. (Smith Affidavit).

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(a)95)(A).

A disability is either (a) a physical or mental impairment that substantially limits one or more major life activities, (b) a record of such an impairment or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The determination of whether a person has a disability under the ADA is made on an individualized case-by-case basis. *Bryne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir. 1992). This determination is made through a three-step process: (1) whether the individual suffers from a "physical or mental impairment", (2) whether the life activity on which the individual relies upon is a "major life" activity, and (3) whether the impairment "substantially limits" that major life activity. See *Bragdon v. Abbott*, 524 U.S. 624, 531 (1998) (*Bragdon*).

Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, learning, and working. This list is illustrative not exhaustive. *See Bragdon*, 524 U.S. at 638-39; 45 C.F.R. § 84.3.(j)(2)(ii) (1999).

The undisputed facts show that Smith suffers from some type of mental impairment. Smith argues his mental impairment substantially effects his sleeping and ability to interact with others.

The ADA regulations define "substantially limited" as: "[s]ignificantly restricted to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.2(j)(1)(ii) (1999).

Three factors are analyzed for determining whether a person's impairment substantially limits a major life activity: (1) the nature and severity of the impairment, (2) the duration of the impairment, and (3) the permanent or long-term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Furnish v. SVY Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). The positive and negative effects of any corrective measures must also be taken into account when determining whether a person is substantially limited in a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999).

In support of his argument, Smith cites to two letters from his physician and counselor and a 1999 medical evaluation. Union Pacific argues that these documents should be stricken because they have not been properly authenticated and are, therefore, not admissible and cannot be considered in reviewing the motions for summary judgment. *See Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987); *Russo v. Palmer*, 990 F. Supp. 1047, 1051 (N.D. Ill. 1998) (striking medical notes that lacked foundation for their admissibility). Smith argues that he will be able to

10

authenticate the documents at trial. In light of Smith's ability to authenticate the disputed documents at trial, the documents are not stricken. *See Eisentadt v. Centel Corp.*, 113 F.3d 738, 742- 43 (7th Cir. 1997).

Smith relies upon his affidavit in which he avers that he has trouble sleeping and fatigue and he ceases having contact with others and becomes very isolated during major depressive episodes. Smith's counselor, England, also states that Smith is unable to work during his major depressive episodes but does not indicate that Smith is unable to sleep or interact socially during such episodes. Smith's 1999 psychiatric evaluation indicates that Smith has trouble sleeping and interacting socially. However, contrary to this evidence, much of which dates back to August 1999, Smith testified in his deposition that during the time of his major depressive episode in 2000, he transferred to Chicago, began training at Proviso, and was able to work for at least two months. Furthermore, after he ceased working in May 2000, Smith contacted Warner via the telephone and wrote letters to several individuals at Union Pacific.

In light of the above, and drawing all reasonable inferences from the above evidence, a genuine issue of material fact exists whether Smith's impairment substantially limits a major life activity.

Union Pacific argues that Smith's claim fails because he was not a "qualified individual"under the ADA because he was unable to perform the essential functions of the job in light of his inability to attend work.

A "qualified individual with a disability" is a disabled person "who ... can perform the essential functions" of his job, including those who can do so only "with ... reasonable accommodation." 42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that he is a

11

"qualified individual with a disability".

Generally, work attendance is an essential requirement of employment. *See Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (*Byrne*); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484-85 (7th Cir. 1999) (*Waggoner*). Here, the only way that Smith could do his job was if he attended work. Accordingly, attendance was an essential requirement of employment.

When a disabled employee cannot perform an essential function of his job, the court must consider whether any reasonable accommodation would help the employee perform those functions. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001) (*Amadio*). If an accommodation "would impose an undue hardship" on the employer's business, the accommodation need not be made. 42 U.S.C. § 12112(b)(5)(A). Allowing medical leave can constitute a reasonable accommodation. *See Amadio*, 238 F.3d at 928. However, an "[i]nability to work for a multi-period removes a person from the class protected by the ADA." *See Byrne*, 328 F.3d at 381. The determination whether an individual is qualified is made at the time of the employment decision. *See Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998).

Here, Smith could not attend work. A leave of absence is an accommodation that could have allowed Smith to be considered a qualified individual although he could not attend work. However, at the time of his termination, Smith was not on a leave of absence. Arguably, Smith had requested a leave of absence as late as August 2000 via his letters to Warner. However, the undisputed facts show that Smith's major depressive episode began in January 2000 and ended in either September or October 2000. Yet, Smith failed to contact Union Pacific in an attempt to return to work or to determine when any leave of absence had or would expire. His only contact with Union Pacific following his depressive episode's ending was after he was terminated. Smith cannot wait until he

has been terminated to inform his employer that he would like an extended leave of absence. *See Amadio*, 238 F.3d at 929, n. 3. Furthermore, extended or indefinite leave of absences are not a reasonable accommodation. *See Amadio*, 238 F.3d at 929; *Waggoner*, 169 F.3d at 484-85; *Nowak v. St. Rita High School*, 142 F.3d 999, 1004 (7th Cir. 1998). Accordingly, Smith was not a qualified individual under the ADA at the time of his termination.

Based on the above, Smith was not a qualified individual under the ADA; and his ADA claims fail. Accordingly, Union Pacific's Motion for Summary Judgment is granted. Smith's Motion for Summary Judgment is denied.

Dated: February 5, 2004

JOHN W. DARRAH
United States District Judge